1127 United States of America versus Yogesh Pancholi. Oral argument not to exceed 15 minutes per side. Ms. Franklin Best for the defendant appellant. Good morning. Good morning, your honors. I'm Elizabeth Franklin Best. I am here on behalf of Mr. Yogesh Pancholi. And respectfully, I'd like to reserve three minutes for rebuttal time. Thank you. And may it please the court. So appellant raises three issues for this court's consideration that the district court erred in denying defense counsel the ability to call a witness at trial, that the court erred in not allowing defense counsel to be relieved during trial, and that appellant was improperly excluded from an in-chambers hearing on the counsel issue. Respectfully, I'd like to start off with the issues of the motion to be allowed to withdraw from the case and the exclusion from the in-chambers meetings, if that's acceptable to the court, because I believe that those two issues are intertwined. Now, during the trial, there appeared to be a pretty extraordinary breakdown in the relationship between counsels and also counsel and the appellant. And appellant has raised two claims regarding this, that his counsel should have been allowed to withdraw during the trial, and that he should have been present for an in-chambers hearing regarding the counsel issue. As to the claim that the counsel should have been allowed to withdraw, I mean, candidly, I recognize that this is, I think, the more difficult claim. But I think it's important because it reveals the extent of the breakdown, which is important in assessing the exclusion of the appellant from this in-chambers meeting. This court assesses this claim through the factors articulated in United States v. Powell, and these militate in favor of allowing trial counsel to withdraw during the trial. The timeliness of the motion. Now, obviously, this was not very good timing. It happened right in the middle of the trial. But that's when the breakdown appears to have occurred. You described this conclusorially as a breakdown. And clearly, there was an issue. Nobody would dispute that. But my understanding is your client didn't ask to have either of the lawyers withdraw. He simply wanted a delay so that the male attorney who was sick could get better, and the court granted that. And I do believe that there was some inquiry made by the judge as to what Mr. Pancholi's desires were and what he believed the nature of the breakdown was. But I think it's important to kind of recognize that as he was explaining to the court some of the problems that he was having, the court then sort of stopped him. Like the moment that it appeared to be intruding into the attorney-client privilege area, the court said, you know, this is going too far. I don't want to hear any more. And this is why I think the exclusion of the in-chambers meeting is really so important, Your Honor. Again, so the court's inquiry into the matter, as you were just referencing. Your client had two trial attorneys. He did. They were both retained. Yes, Your Honor. And did he ever indicate that he fired one of them? Or, I mean, he didn't consent to the withdrawal, I could see. But he never terminated their services, right? Well, I mean, and it's true that that's not on the record, that he fired them. I mean, I think that... I mean, they're retained as opposed to appointed counsel. Yes, Your Honor. He's got two of them. He does. And you'd think that he had the authority to control his two attorneys. And respectfully, Your Honor, I mean, I think that, I mean, this is sort of the issue, right? I mean, there was some inquiry that was made into sort of what the nature of this breakdown was. But it was never really sort of fulsomely explored. And that's why when counsel wanted to have this meeting in chambers regarding, you know, what the parties were going to say about their own performance, that this is really when the appellant needed to be present. I mean, he had... He didn't assert his right to be present. I mean, even if he had a right, but he didn't even claim it. His attorney agreed. Attorneys usually bind the lawyer. He himself didn't pipe up and say, I want to go in there. Why isn't that issue just waived? Well, and so, Judge Larson, I mean, I think if you look at the record, you know, the judge came out and said, he's not coming back. And then at that point, counsel acquiesced.  I mean, so clearly... But you need to object if you think the judge is wrong. Well, and I understand that. Point well taken, Your Honor. But I think what the difficulty... I mean, I think this is part of the problem, right? I mean, at the time that they're going back into chambers to have this discussion, that particular lawyer's performance was under the microscope. I mean, so arguably, he was sort of conflicted at the time that he's acquiescing to his client's removal from this. You know, the court never addressed the defendant, the appellant specifically, which is why I think the waiver analysis is perhaps, you know, not the correct way to look at it. I mean, you know, he never waived anything. But is that even his right to waive, right? I mean, yes, it's his right. But ordinarily, counsel speaks for the client. And there's a very small list of things where the client gets to speak instead of the lawyer. Absolutely. I mean, I completely acknowledge that. But I think that when the issue here was the counsel effectiveness and what was really happening with this breakdown in the relationship, I mean, this is exactly the kind of factual development that the defendant... Your argument... I mean, the defendant also... Sometimes we read a lot of transcripts, and sometimes the defendant will, in fact, say, well, my lawyer might not object, but I do. Is it your view that it was on the judge to address the client? Well, I mean, I think the nature... I mean, this was a really unusual situation. And I believe that the nature of these claims, right, that trial counsel was rendering ineffective assistance of counsel, that there were these problems in the relationship. And then the court just sort of summarily said, he's not coming back. And then, you know, counsel says, okay, okay, and so let's go back. And then they have this, you know, pretty fulsome conversation. I mean, I think they were gone for about an hour and a half in which issues of the effectiveness of counsel were discussed. And they happened without the appellant's input at all. And the problem that I'm having with that is even if you assume for purposes of our discussion that there was a breakdown, we don't know what the breakdown was. It's not in the record anywhere. There's no offer of proof. There's no affidavit from your client that says, I wanted him to do X and they refused. And if I had known that, I would have gotten a new lawyer. The record is just silent. And I think it's silent because the defendant, or because the appellant was excluded from this in-chambers hearing. I mean, when they were going to really sort of fill out all of this information, he wasn't allowed in there. I mean, I think that the reason why the record is not is... I assume that this ex parte meeting was not on the record, right? Well, I mean, it was on the record. I mean, there was a court reporter. I've forgotten whether it was transcribed. It was transcribed. Okay. So what in all of that shows that there was a breakdown? Well, I think if the appellant had been permitted to be there, we could have found out more about it. I mean, again, I think that that's why his absence from that really critical hearing is so important. I mean, that was the time... In order for us to assess any sort of prejudice, we would have to know how your client was harmed. So what was the breakdown? How was your client harmed by this? And we can't do that in the absence of a record. Well, I mean, so I understand it's a bit of a catch-22, but this is why, I mean, it is so incumbent upon the court to make sure that, you know, an appellant's rights are respected in this way that he's... But nobody objected for the court. So you're saying this is plain structural error? And I do think if the court believes that there's some waiver that, you know, that this court can assess that under a plain error standard, Your Honor. I'm still kind of struck with the fact that he's retained two attorneys. He's in control of which attorney does what. When you usually have two attorneys, one has to be the lead attorney that can speak for the other. They can't both speak and say, I want to do this, I do that. One of them is the lead attorney. Your client controls that. And one of the attorneys wants to withdraw. He's still got the other one, and he can control that one. And you haven't really presented evidence that say that the withdrawal, that you were prejudiced by not letting this guy withdraw. Your client could say, okay, I don't want him to do anything else. You're not going to let him to withdraw. He can sit second chair over here. The other attorney can do everything in the trial. And that's your client's prerogative, right? I mean, I agree. I mean, I think that this is something that... So the fact that one doesn't withdraw, while the client can say, well, I don't trust him. I want the other one to do everything. Fine, that's his call, right? Well, and I think if there had been an opportunity for him to really sort of explain to the court what was happening. Again, we have a judge here who really wouldn't allow him to get into this. I mean, the moment that she perceived that he was entering into this attorney-client relationship information, she stopped him. She didn't want to hear anymore. And then when counsel said, if we're going to talk about who's incompetent and all the rest of it, can we please do this back in chambers? Then they all sort of head there. So that would have been the opportunity for him to really sort of get his input into this. We do have to establish whether there's some prejudice here. I appreciate you saying that these are intertwined. But it seems to me that sort of leads to the source of your problem. Because if it's ineffective assistance of counsel, this seems to me exactly why we don't take these up on direct appeal. We take them up on habeas because then you've got this vehicle for substituting the record. The lawyers can put in affidavits or whatever. So why wouldn't that aspect of this joined issue await 2255? Well, and I do appreciate that. I mean, I think, candidly, there were some procedural issues here. I believed in some briefing all this that there was enough on this record that the court could assess that prejudice because it was so clear that he should have been able to kind of offer some additional input into sort of the nature of his relationship. Counsel, I see your yellow light is on. I really wanted to talk about the first issue, which is the excluded witness. So I think you have a similar problem here in that you don't have any record evidence about what the witness would have said. And it seems to me that the value of the witness testimony must come in at some point, either at the front end, deciding whether the right was violated, or at the back end in deciding whether any error was harmless. And here, we have not, we don't have any way to do that. So I just wanted to let you address that, if she may, because...  Okay, thank you, Your Honor. You know, so again, I recognize that there was an offer, and we typically like to see these in the record. And to answer your question, I mean, I think that there's enough in this record to see how important this particular witness was that the prejudice to him could be inferred, given sort of the basis of knowledge that she would have had about the issues that were, you know, at issue in this trial. Well, she might have had knowledge, but how do we, why would we presume that it was exculpatory? Well, we knew that based on what defense counsel said after having interviewed her. Well... He just said it's exculpatory. He didn't say how and why, when other witnesses say that they both instructed them to turn in these false claims. Yes, Your Honor, I recognize that issue. Okay. Thank you. You'll have your rebuttal. Good morning. Good morning, Your Honors. May it please the court, Josh Handel for the United States. This case is about the extent to which we trust district judges to make reasonable on-the-spot decisions when unexpected issues arise in the middle of trial. This court has held time and again that the deference you give to district judges is at its zenith when you're being asked to second-guess their trial management decisions on a cold appellate record. Here, the district court faced two mid-trial complications. It approached both with sensitivity to the various interests at stake, and it amply explained its reasoning on the record. And no aspect of that reasoning suggests that this is the extraordinary case warranting reversal. Now, I'd like to start with the issue that I believe Your Honors were just discussing with my friend on the other side, having to do with the exclusion of Lena Shaw on the last day of trial. And I'll just fast forward right away to the prejudice inquiry. You know, just to kind of preserve the argument, we certainly believe that completely independently of prejudice or harmlessness, the district court made the right call here and it appropriately exercised its discretion. But just in terms of the prejudice inquiry that Judge Larson, you asked my friend about, even if you were persuaded that the district court erred or abused its discretion in denying the defense's request to call Lena Shaw at the last minute, Ms. Shaw's testimony could not have resulted in a different outcome in this case. As we describe at page 22 of our brief, Ms. Shaw was entirely uninvolved in the large majority of the offense conduct. Specifically, no trial testimony linked Ms. Shaw to Mr. Pancholi's straw purchase of Schring Home Care in contravention of his exclusion agreements with Medicare, to his theft of identities to execute that purchase and perpetuate his fraudulent enterprise, to his laundering of Schring's proceeds through the Medco staffing account to which he had sole access, or to his false allegations of visa fraud to prevent Sai Pagodula from reentering the country and testifying against him. Now, to the extent that Ms. Shaw appears to have been involved in other aspects of the fraud, the trial evidence strongly indicated that she was a junior partner to Mr. Pancholi. Ms. Shaw was trained by Mr. Pancholi. That's at record pages 973 to 974. Ms. Shaw and Mr. Pancholi jointly supervised the submission of claims to Medicare. That's at 1174 to 1179. And it was Mr. Pancholi, not Ms. Shaw, who is the sole signer on the Medco staffing account to which all $2.8 million in ill-gotten funds was transferred. And thus it was Mr. Pancholi who was the sole financial beneficiary of this fraudulent scheme. Do we have to even get into any of this? We don't have any. Here we have a witness. The witness was excluded. The argument is that was error. Counsel has admitted that she can't tell us what the witness would have said. So on this record, we can't possibly balance the value of that testimony against any other harms, either at the front end or the back end in doing harmlessness. So I guess my fundamental question is, whose job was it to make a record below to give some kind of a proffer to tell us what the witness would have said? Was that your job, the court's job, or counsel's job? Well, Your Honor, I think it's axiomatic that it's the proponent of the evidence who bears the burden of establishing a basis for admissibility of the evidence and also for the evidentiary value. And that's, I think, consistent with what this court said in United States v. BRCA, which we cite on page 21 of our brief. The proponent of the evidence has the burden of proof and must lay an appropriate foundation. I would point out that Mr. Pancholi below did not request voir dire or an ex parte hearing. He did not suggest any sort of alternative mechanism to build a better record as to what Ms. Shaw would have said. We certainly have arguments for why voir dire wouldn't have remediated all of the concerns with this surprise witness coming in unrepresented on the last day of trial, but it would have built a more robust record in terms of allowing this court to evaluate what prejudice, if any, attached to the exclusion of this witness. How could there even been a voir dire in terms of getting into what she would say given her Fifth Amendment rights? Right. Judge McKee, I mean, that would be one of our arguments for why voir dire would not have been appropriate here, but my point is just that... I thought you were just suggesting that they should have done voir dire. My point is just that the defendant did not proffer any sort of alternative mechanism for looking at what Ms. Shaw would say, right? I mean, everybody agreed that Ms. Shaw walked into court. She was unrepresented. There were Fifth Amendment issues all over the place. Everyone agreed that she could not testify in that condition because she would have run an extreme risk of self-incrimination. Just out of curiosity, whatever happened to her? Did she get indicted? Your Honor, I do not believe that she has been charged. So there's no other record that might be public that would shed light on her involvement or what she admitted to or was convicted of? Right. I'm not aware of anything like that. I mean, this is another area where potentially on post-conviction habeas review, when you're allowed to kind of bring in more things outside of the four corners of the trial record, they could possibly build a record and show some sort of prejudice. But based on the record that we have here, there is certainly no availing claim of prejudice from the exclusion of Ms. Shaw. And I'm not aware of any other proceeding that we could point the court to where Ms. Shaw was charged. Unless there are further questions on the witness exclusion claim, I'll move to the denial of the withdrawal motion. So how do you read this court's opinion in forensic? Do you think a showing of bad faith is required or do you think that forensic leaves room for a balancing test that excludes sort of bad faith on the part of the defendant? Your Honor, I absolutely believe forensic leaves space for a balancing test. I think that that is fully consistent with the Supreme Court's decision in Taylor v. Illinois. So obviously, bad faith on the part of the defendant, dilatory conduct or kind of hiding a witness until the very last minute, that will frequently justify the sanction of witness preclusion. But I don't think that's the only thing that can. And I would point the court to the language in Taylor v. Illinois where the Supreme Court said, it is neither necessary nor appropriate for us to attempt to draft a comprehensive set of standards to guide the exercise of discretion in every possible case. And then Taylor identified the fair and efficient administration of justice as an interest bearing on the appropriate remedy, even independently of any finding of bad faith or what we might consider, you know, kind of traditional forms of misconduct. I think that's fully consistent with forensic. I mean, you know, the facts in forensic were very different from what we had here. You had an expert who came in. This was 11 days before trial. You know, it seems that they had missed an expert disclosure deadline, but it was still well in advance of trial. The expert came in, the expert was ready and able to testify. If you're looking for a decision of this court that I think is on point, I would point the court to Franklin v. Bradshaw, which denied habeas relief where the request was much closer to what we have here. It was a mid-trial continuance request in order to obtain a hypothetical new expert witness, which I think is, you know, right on all fours with what the district court denied here. An indefinite pause in the proceedings on the last day of trial to permit Lena Shaw's unlikely future testimony. Unless there are further questions on this issue, I'll move to the withdrawal and conference in chambers. So in United States v. Mack, this court set out a four-factor test to govern attorney withdrawal and substitution motions. We would contend that each of the four Mack factors, timeliness of the request, adequacy of the court's inquiry, extent of the asserted conflict, and the public interest in the efficient administration of justice, supports affirmance here. I understood my friend to mostly focus on the absence of Mr. Pancholi from the chambers conference, so I'll kind of hone in on that specific issue. There was no error in the district court's conduct of the in-chambers hearing on Ms. Prasad's withdrawal motion. As a threshold matter, it's our view that the Supreme Court's decision in United States v. Gagnon, which was discussed at pages 42 through 44 of our brief, forecloses Mr. Pancholi's claim. There, as here, you had an announcement in open court that the trial judge would be convening an in-camera conference without the defendant present. There, as here, the defendant leveled no objection to that plan, and the court proceeded accordingly. And there, the Supreme Court held that the failure by the criminal defendant to invoke his right to be present under federal rule of criminal procedure 43 at a conference which he knows is taking place in chambers constitutes a valid waiver of that right. So in our view, Gagnon disposes of this claim. In the event this court reaches the merits, whether on invited error or plain error review or otherwise, the appropriate inquiry is set out in the Supreme Court's decision in Kentucky v. Stintzer, which we cite at page 45 of our brief. That case asks whether the defendant's presence was necessary to guarantee a fair and just hearing. Here, the district court correctly determined that Mr. Pancholi's presence in chambers was neither necessary nor appropriate to such a hearing. It was not necessary because his attorneys would be present and could be expected to candidly address the dispute that had arisen. And in fact, the record reveals that they did so. And I just kind of want to get into this a little bit. You know, when this motion came up in court on, I think it was toward the end of trial, the court did colloquy Mr. Pancholi to ask what his view was on this motion. As my friend mentioned, Mr. Pancholi, you know, talked for a little while and then he started to, I believe, inadvertently divulge trial strategy discussions that had gone on between him and his trial attorneys. The court paused things at that point and said, you know, you're getting into attorney-client privileged communications and that's not appropriate for this record. But the court did say, you know, I do want to know your bottom line. What's your, you know, bottom line opinion on this? And Mr. Pancholi said, you know, my bottom line is I cannot have an attorney who wants to withdraw. That's at record page 1453. So Mr. Pancholi was essentially saying if Ms. Prasad wants to withdraw, then that's fine by me. And that's why the court convened the in-chambers conference and heard extensive argument and discussion from Mr. Harrison, Ms. Prasad, and also, you know, some commentary from the government. And during the in-chambers conference, the record reflects that defense counsel were candid, honestly, to the point of being self disparaging about Mr. Pancholi's, the root of Mr. Pancholi's dissatisfaction with his representation. Ms. Prasad said, quote, the client has indicated to me that I kind of created a mess of things and there's no confidence that I can continue in this case. Mr. Harrison said, quote, he has no confidence in our continuing to represent him. And I'm at the point where I'm not sure that ethically I can represent him because now he's expressed on the court's record that he felt I needed rest. So the court was well apprised of Mr. Pancholi's views. It does not appear from the record that the attorneys pulled their punches or that they were, you know, safeguarding their reputations or any of the bases that we might think of for a conflict of interest. And the court, you know, I think appropriately heard from them, heard from the government, shared some of its own reflections and observations from how the attorneys had performed during the trial. And then it reached a reasoned and reasonable disposition, which was declining to dismiss half of Mr. Pancholi's defense team in the middle of trial. Unless the court has further questions. Questions, Judge McKee, Judge Larson. No, thank you, counsel. Thank you. Three minutes for voting. Thank you, your honors. Just to kind of talk a little bit more about the chamber's meeting. I just want to draw the court's attention to just how significant of a breakdown this appears to have been. I mean, initially it was the government that actually brought this to the court's attention. When a counsel referred to the other counsel as incompetent and the government took it so seriously that they brought this to the court's attention. You know, at one point, Mr. Harrison talked about what a painful experience this had all been. Ms. Prashad talked about what a complete deterioration of the relationship there had been. We know Mr. Harrison had a head cold and we know that he had difficulty standing during the cross-examination of one of the witnesses. So, you know, perhaps Mr. Pancholi would have fired one or both of them had he been allowed to sort of fully air his grievances. You know, when they- Didn't your client say he was satisfied with Mr. Harrison except the fact that he had such a bad cold and he needed time to rest? So- As long as the court gave him time to rest that he would be very satisfied to have him continue representation. Isn't that the- Yes, Your Honor. I mean, so he did make that remark on the record. It doesn't seem to me like he's requesting that that he consents to the withdrawal of counsel, that's all. But then they had this chambers meeting and the chambers meeting was at the request of trial counsel. I mean, so they were going to explore this further. You know, this was the kind of factual development piece that a defendant should be present for where all of these things were aired. And that's why I think this is such a critical problem in this case. Are you even taking the position that had he been there and explained whatever you think he might have said to the judge that there would have been a dismissal of one attorney to the other and that's the prejudice? And I believe that that may very well have been the case. I mean, when we look at- But it's just pure speculation, isn't it? Except that, again, when you read sort of the transcripts and you can read from Mr. Harrison's sort of remarks, I mean, he clearly wanted to kind of get off this case. I mean, I think that they were, again, sort of candidly talking about how upset Mr. Pancholi was with the breakdown of this relationship. So, I mean, I do think there are enough indications in the record just to show that, in fact, he was very unhappy. And if you- Let's look at it a slightly different way. It seems like the female attorney made a really inappropriate remark to the government counsel in a break. Would that be fair? Yes, Your Honor. Would she then disavow it? She said it was a bad choice of words. She was never intending to suggest that Harrison was incompetent, right? Yes, Your Honor. And we don't have any evidence in the record that either of them were incompetent. I mean, yes. I'm just fearful, and I may be overblowing this, but I'm just fearful that when defense lawyers see a case going south, at the end, if they just say something really stupid, like my co-counsel is incompetent, then all of a sudden, everything grinds to a halt. You've got to replace people. It's pretty easy how to bail out of a losing case. You would be having us establish a training manual on how to get out of a bad case. Except that I think that lawyers, professional ethics would militate against that. I mean, this was a really sort of factually unusual situation. And I think there's, in this case, it doesn't appear that the reason why this happened was because they were trying to bail out of a losing case. I mean, it looked like this was really a very painful experience for all of them. Thank you. Any further questions? All right. Thank you, counsel. Case will be submitted.